ACCEPTED
14-13-00824-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
11/23/2015 4:29:17 PM
CHRISTOPHER PRINE
CLERK

No. 14-13-00824-CV

IN THE
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
11/23/2015 4:29:17 PM
CHRISTOPHER A. PRINE
Clerk

## TAMIMI GLOBAL COMPANY, LTD.

*Appellant/Cross Appellee,*

**v.**

## KELLOGG BROWN & ROOT, L.L.C., KELLOGG BROWN & ROOT INTERNATIONAL, INC., AND KELLOGG BROWN & ROOT SERVICES, INC.,

*Appellees/Cross-Appellants.*

## MOTION FOR REHEARING

Lauren B. Harris
Texas Bar No. 02009470
lharris@porterhedges.com
Nicholas A. Simms
Kerry M. McMahon
David W. Salton
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6624
Facsimile: (713) 226-6224

*Attorneys for Appellees and Cross-Appellants Kellogg Brown & Root, L.L.C., Kellogg Brown & Root International, Inc., and Kellogg Brown & Root Services, Inc.*

**TO THE HONORABLE FOURTEENTH COURT OF APPEALS:**

Pursuant to the Texas Rules of Appellate Procedure, Appellees and Cross-Appellants Kellogg Brown & Root, L.L.C., Kellogg Brown & Root International, Inc., and Kellogg Brown & Root Services, Inc. (collectively "KBR") file this Motion for Rehearing, and would respectfully show the Court as follows:

## Argument

KBR files this motion for rehearing to address a single issue: whether this Court properly affirmed the district court's denial of KBR's breach of contract counterclaim seeking recovery of $930,000 in attorneys' fees and costs it incurred in third-party litigation arising from Tamimi's payment of illegal kickbacks. This Court affirmed the trial court's findings that the collateral litigation against KBR was not caused by Tamimi's breach of the contract by offering kickbacks, but the *acceptance* of those kickbacks by two KBR employees (Terry Hall and Luther Holmes). Op. at 43-47. KBR respectfully urges this Court to reconsider its decision because the Court's analysis is contrary to controlling standards of causation the Texas Supreme Court has carefully established.

**I.      Tamimi's Offers of Kickbacks and Their Acceptance By Hall and Holmes Were Concurring Causes of KBR's Damages.**

The Court's causation analysis demonstrates that it failed to properly adhere to controlling standards for evaluating causation, and in particular, for applying the "substantial factor" test. Rather than properly considering *Tamimi's* conduct in

1

paying kickbacks, the Court incorrectly determined that causation was not proven because of Hall and Holmes' *acceptance* of the illicit offer. The breakdown in the Court's reasoning, however, is that Tamimi not only initiated the entire chain of events by offering kickbacks, but it *paid* them over an extended time period and allegedly benefitted from those payments—the very reason the United States government deemed its contract "tainted" and KBR was sued. The acceptance of kickbacks was, at the very least, a concurring cause of KBR's damages.

The Court's analysis further demonstrates that it improperly treated the acceptance of kickbacks as a superseding cause that absolved Tamimi from any liability. That theory, however, has no application under these facts where the acceptance of kickbacks was within the scope of the risk created by Tamimi's conduct and foreseeable. The Court then compounded its error by erroneously concluding that the federal counterclaim attributed any misconduct only to the acceptance of kickbacks, when that interpretation is refuted by its plain language. Tamimi's breach of the contractual anti-kickback provision was a "substantial factor" in causing the government's federal counterclaim as a matter of law.

## A. The "Substantial Factor" Standard Does Not Require Tamimi's Conduct To Be The Sole Cause of Harm.

The trial court misconstrued the "substantial factor" test to require that Tamimi's conduct be the *only* cause of KBR's damages. The trial court criticized KBR for failing to offer proof that the United States would have "filed its

2

counterclaim had there been an offer of kickback from Mr. Khan but no acceptance by KBR employees." CR2592-93¶12. In other words, the trial court incorrectly construed the "substantial factor" standard to essentially require KBR to eliminate Hall and Holmes' conduct as a basis for the counterclaim—disregarding that, at the very least, Tamimi's conduct was a concurrent cause of KBR's damages.

The "substantial factor" test permits a finding of causation-in-fact notwithstanding concurrent causation by other intervening events. *See Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 222-23 (Tex. 2010). The proximate cause standard has been defined to include the substantial factor requirement (cause-in-fact) as well as a foreseeability component:

> "Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such an event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

*See* State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC §100.14 (2012 ed.); *Crump*, 330 S.W.3d at 223. The trial court's analysis fails to recognize that there can be more than one cause of an event, and that a concurrent act that cooperates with the original act will not cut off the liability of the original wrongdoer. *See Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992); *Bell v. Campbell,* 434 S.W.2d 117, 122 (Tex. 1968); 2RR41.

3

The foreseeable conduct of another does not break the chain of causation.[1] *See*

*Mewhinney v. London Wineman, Inc.,* 339 S.W.3d 177, 182 (Tex. App.—Dallas

2011, pet. denied).

The trial court mistakenly believed that the "substantial factor" standard

imposed a higher burden on KBR that its plain language implies. CR2592¶11. In

*Crump,* the Texas Supreme Court rejected the view that the "substantial factor"

requirement imposes a higher threshold, stating:

> The word "substantial" is used to denote the fact that the defendant's
> conduct has such an effect in producing the harm as to lead reasonable
> men to regard it as a cause, using that word in the popular sense, in
> which there always lurks the idea of responsibility, rather than in the
> so-called "philosophic sense," which includes every one of the great
> number of events without which any happening would not have
> occurred. Each of these events is a cause in the so-called "philosophic
> sense," yet the effect of many of them is so insignificant that no
> ordinary mind would think of them as causes.

*Crump*, 330 S.W.3d at 224 (citing *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472

& n.1 (Tex. 1991)). Despite the supreme court's guidance, the trial court declined

to find that Tamimi could be "responsible for whatever happens next."

CR2592¶14.

---

[1] These Texas cases discuss the proximate cause standard in the context of tort claims, such as general negligence. However, to the extent the trial court and court of appeals applied the proximate cause standard here, these cases are applicable.

The trial court and Court of Appeals erroneously failed to recognize that Tamimi initiated the chain of events causing the ultimate harm, *i.e.* paying the kickbacks that "ensured that Tamimi would obtain lucrative dining facility ("DFAC") subcontracts from KBR," and that the government alleged resulted in inflated claims. KBR Ex. 23, ¶108; App. Tab A. This is not a situation (as the Court here appears to have accepted) where a mere offer and attenuated acceptance occurred. The scheme between Tamimi, Hall and Holmes took place over an extended period, as Tamimi continued to pay them over the course of more than a year. *Id.* at ¶115. Throughout this period, Hall and Holmes were allegedly involved in making decisions that continued to benefit Tamimi as it received lucrative contracts from KBR. *Id.* at ¶116. Tamimi's conduct was a substantial factor in sparking the government's counterclaim as a matter of law, and, at least, a concurring cause of KBR's damages. The trial court's contrary decision is also against the great weight and preponderance of the evidence.

The trial court never properly focused on the conduct of *Tamimi* and its contractual breaches, or considered the foreseeability component of the proximate cause test. The possibility that a lower level KBR employee might accept kickbacks was certainly foreseeable to Tamimi. *See, e.g. County of El Paso, Tex. v. Jones*, No. EP-09-CV-000119-KC, 2009 WL 4730303 *11 (W.D. Tex. 2009) (not designated for publication) ("Because it is also foreseeable that Defendants'

conduct in offering bribes to Flores would lead to acceptance of the offer, the County has established proximate cause.").  In fact, the prohibition on kickbacks was expressly stated in the parties' subcontracts.   These subcontracts were reviewed by Shabbir Kahn ("Kahn"), who ran Tamimi as its chief of operations. 2RR75, 3RR26, 31.  And it was Khan who was responsible for initiating the kickbacks.  3RR23, 27-28, 32, 39.  *Also see El Chico Corp. v. Poole*, 732 S.W.2d 306, 314 (Tex. 1987) (recognizing that it is foreseeable that the sale of alcohol to a minor will result in the minor driving while intoxicated and causing injury to himself or others).

Mark Lowes, in-house counsel for KBR, was the only expert witness to testify as to KBR's attorneys' fees and the reason why they were incurred:

> Q:    (Mr. Simms):  And how did the offer of bribes to Terry Hall cause damages to KBR?
>
> A:    (Mr. Lowes): Well, but for that, we would haven't had the counterclaim and we wouldn't have had to defend.  We would have only had the contract action.

3RR24.

> Q:    (Mr. Klasing):  ….isn't it true that the trigger for every single one of these causes of action,….is the fact that KBR employees actually took kickbacks from someone?
>
> A:    (Mr. Lowes): You and I have and I have had this semantic discussion before and I respectfully disagree.  Our contract says you're not going to make the offer, but for the offer, it's impossible for anyone to accept it….

3RR80-81. Tamimi did not offer any witness to contradict this testimony. *Also see* 3RR53 ("…but for the bribe, which the government claimed tainted the contract, I wouldn't have had to defend these actions."). Because the court misinterpreted the "substantial factor" test to require KBR to disprove that Hall and Holmes' conduct was also a reason for the government's counterclaim, the judgment should be reversed.

**B.     Hall and Holmes' Acceptance of Kickbacks Was Not An Intervening Cause That Vitiated Tamimi's Liability.**

Without expressly using the term "new and independent" (or superseding) cause, this Court and the trial court effectively decided that Hall and Holmes' acceptance of the kickbacks absolved Tamimi of liability for the consequences of its breach. However, this inferential rebuttal theory has no applicability where the intervening forces are foreseeable and within the scope of the risk created by the defendant's conduct.

A "new and independent cause" is one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause. *See Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450 (Tex. 2006). An intervening cause supersedes the defendant's conduct and destroys the causal connection between that conduct and the plaintiff's injury. *Id*. However, this Court and the trial court failed to recognize that if the intervening force was foreseeable, it is "considered to be a

concurring cause of the plaintiffs' injuries and the defendant remains liable." *Id.* at 451.

As the Texas Supreme Court noted in *Dew*, intervening forces are within the scope of the original risk created by the defendant's misconduct:

> Obviously the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which the defendant has subjected the plaintiff has indeed come to pass. Foreseeable and intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in this category will not supersede the defendant's responsibility.

*Id.* at 453. "Where the intervening act's risk is the very same risk that renders the original actor negligent, the intervening act cannot serve as a superseding cause." *Id.*

Similarly, it is no defense to Tamimi's liability that the acceptance of the kickbacks was a criminal act. Intentional criminal conduct is also not a superseding cause of injury where the criminal conduct is foreseeable. *See Phan Son Van v. Peňa*, 990 S.W.2d 751, 753 (Tex. 1999). As stated in the Restatement of Torts,

> [t]he act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless* the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

8

*Id.* at 753, citing RESTATEMENT (SECOND) OF TORTS §448 (1965). Here, Tamimi's conduct went well beyond being merely negligent—Tamimi *intentionally* committed a crime by offering a kickback and created a situation where that offer was accepted.

The Court effectively (but incorrectly) decided that Hall and Holmes' acceptance of kickbacks relieved Tamimi of any responsibility for its breach, allowing Tamimi to breach its contracts with impunity. Although the trial court acknowledged the federal court of claims' finding that knowledge of the kickbacks had not been imputed to KBR in the federal court proceeding (CR2591¶6, KBR Ex. 25; 3RR58), the court improperly decided that it was *KBR's* acceptance of the kickbacks that caused the collateral litigation against KBR. The trial court, however, never made any finding that KBR was responsible for the illegal actions of Hall and Holmes, or that their conduct was authorized. *See J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 636 (Tex. App.—San Antonio 1993, no pet.) (finding that claim of respondeat superior was waived where no evidence of course and scope of employment was presented). The trial court's determination that KBR's conduct, and not Tamimi's, was the cause of KBR's damages is in error.

### C. The Court Improperly Construed The Federal Pleadings To State That The Counterclaim Was A Result of KBR's Conduct Alone.

The Court's affirmance of the trial court's judgment is also in error because the lower court solely relied on the federal court counterclaim to decide that the

9

lawsuit was caused by "KBR's acceptance of the offer which triggered the litigation." CR2592. However, the trial court disregarded the allegations throughout the petition that Tamimi's repeated illicit *payments* to Hall and Holmes also served as a basis for the counterclaim.

The allegations in the counterclaim describe a course of payments *Tamimi* made over several years, after Hall initially declined the offer "but reported it to nobody." *See* KBR Ex. 23, ¶114-116; App. Tab A. The pleadings further describe decisions for the "benefit of Tamimi as a KBR subcontractor" during the time the payments were made. *Id.* at ¶116. The government also alleged that these kickbacks resulted in "inflated contract prices from Tamimi for which KBR sought reimbursement." *Id.* at ¶118. Any conclusion that the government filed its counterclaim purely based on Hall and Holmes' *acceptance* of the kickbacks, belies the plain language of the pleadings.[2]

If the focus of the counterclaim was on KBR, it was because Tamimi, as a subcontractor, was not a party to that litigation. It is undisputed that Tamimi and

---

[2] At the hearing on the motion for entry of judgment, the trial court stated that the basis for his judgment was that "the only actual evidence I had was the federal government saying that it was the acceptance of the offer and not the making of the offer that caused their lawsuit." 1RR7. To the contrary, the pleadings state that the "counterclaims *generally* arise from the receipt of kickbacks by KBR employees *from Tamimi Global Company*." KBR Ex. 23, ¶108 (emphasis added); 3RR 23. Nowhere do the pleadings state that Tamimi's payments played no role in the litigation.

Khan were, in fact, separately prosecuted for their roles in the scheme. Tamimi was charged with conspiracy to pay kickbacks and conspiracy to pay gratuities. 4BRR at DX 11, ¶1. Tamimi entered into a Deferred Prosecution Agreement with the government (4BRR at DX 11) (App. Tab B), and Khan went to prison (4B RR at DX 16). As part of the Deferred Agreement, Tamimi expressly admitted that it was responsible for the "past crimes" and "unlawful conduct" of Khan in paying kickbacks to Hall and Holmes (described therein as "Person A"). 4BRR at DX 11, ¶4, 22, Attachment A, ¶1, 41-43; 3RR31, 35. Tamimi also agreed to pay a monetary penalty of $5.6 million. 4BRR at DX 11, ¶8. According to the agreement, Khan made the payments to Hall and Holmes "in order to ensure that [Tamimi] kept the DFAC subcontracts that it had, and to ensure that [Tamimi] would continue to get additional subcontracts as they became available." *Id.* at ¶43.

The government's counterclaim against KBR, as well as Tamimi's plea agreement, unequivocally describe Tamimi's pervasive role in paying illegal kickbacks to obtain subcontracts at inflated prices. The trial court and court of appeals' decisions that the federal court litigation was only attributable to conduct of KBR is simply wrong.

## II. Texas Law Allows for The Recovery of Attorneys' Fees Incurred In Defending Foreseeable Litigation Caused By A Breach of Contract.

Although the trial court and this Court applied the "proximate cause" standard in this case, that test is not typically applied in a breach of contract dispute. *See Abraxas Pet. Corp. v. Hornburg*, 20 S.W.3d 741, 758 n.12 (Tex. App.—El Paso 2000, no pet.); *Winograd v. Clear Lake City Water Auth.*, 811 S.W.2d 147, 156 (Tex. App.—Houston [1st Dist.] 1991, writ denied) ("While proximate cause must be proven in a tort action, it is not the causal standard applied in a suit for damages for breach of contract."); *see* Michol O'Connor, O'CONNOR'S TEXAS CAUSES OF ACTION, ch. 5-B, §2.1 (2015 ed.). The Texas Supreme Court has indicated that the proper test for breach of contract is whether the damages "result from" the alleged breach. *See McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 209 (Tex. 1985). Even if this higher standard is applied,[3] however, KBR was still entitled to recover its attorneys' fees as a matter of law.

---

[3] The requirement of foreseeability is a more severe limitation of liability than is the requirement of substantial or "proximate" cause in the case of an action in tort or for breach of warranty. *See* RESTATEMENT (SECOND) OF CONTRACTS §351 cmt. a (1981). Even so, KBR should also prevail under the foreseeability test.

The Restatement (First) of Contracts §334 contemplates that attorneys' fees incurred in the defense of collateral litigation caused by a defendant's breach of contract are recoverable. The Restatement provides:

> If a breach of contract is the cause of litigation between the plaintiff and third parties *that the defendant has reason to foresee when the contract was made*, the plaintiff's reasonable expenditures in such litigation are included in estimating damages.

*See* RESTATEMENT (FIRST) OF CONTRACTS §334 (1932) (emphasis added). As the Restatement recognizes, the key inquiry is the *foreseeability* of third party litigation expenses resulting from any breach. *See Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981) ("In an action for breach of contract, actual damages may be recovered when loss is the natural, probable, and foreseeable consequence of the defendant's conduct."). A contracting party is expected to account for those risks that are foreseeable at the time the contract is made. *See* RESTATEMENT (SECOND) OF CONTRACTS §351 cmt. a, c.

Foreseeability is a fundamental prerequisite to the recovery of consequential damages for breach of contract. *Basic Capital Management, Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011). As the Texas Supreme Court has recognized:

> Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful acts. They are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach.

13

Thus, to be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it.

*Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) (per curiam) (internal citations omitted). Texas jurisprudence regarding the foreseeability requirement has been derived in part from *Hadley v. Baxendale*, in which the court recognized that:

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i.e.* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it.

*Basic Capital,* 348 S.W.3d at 901*, citing Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145, 151 (1854).

The Texas Supreme Court has specifically acknowledged the applicability of section 351 of the Restatement (Second) of Contracts in which the parameters for determining whether a loss is a foreseeable result of any breach is defined. *See Basic Capital,* 348 S.W.3d at 901-02. The Restatement provides:

> (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
>
> (2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
>
>     a. in the ordinary course of events, or

14

b. as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

*See* RESTATEMENT (SECOND) OF CONTRACTS §351. If the contract is silent as to risks the defendant has assumed, courts will determine what risks were foreseen or foreseeable when the contract was made by viewing the matter in the light of common sense, considering the nature and purpose of the contract, the surrounding circumstances, and what liability the breaching party may reasonably have assumed. *See* 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS §64:13 (4th ed.).

In *Basic Capital*, the Texas Supreme Court, applying this test, reversed the court of appeals' determination that lost profits a borrower claimed as consequential damages for breach of a commitment to provide financing were not foreseeable. *Basic Capital*, 348 S.W.3d at 902-03. The lender agreed to loan the borrower $37 million to acquire and rehabilitate three commercial buildings, if its other entities would borrow $160 million over a two year period. After loaning $37 million to acquire the buildings, however, the lender refused to provide further financing once interest rates rose. *Id.* at 897. The borrower claimed damages for lost profits, which the court of appeals disallowed. The Texas Supreme Court reversed the court of appeals' determination that the borrower's lost profits were not foreseeable. *Id.* at 901-02. The Court reasoned that the lender "cannot profess

15

blindness to foreseeability that its breach would also cost [the borrower] business."
*Id*. at 903.

Applying these principles here, there is no question that Tamimi's breach of the contract precluding the offer of kickbacks was a cause of collateral litigation initiated by the government. As in *Basic Capital*, Tamimi cannot claim that it was unaware that if it breached the contract by offering kickbacks, those offers might be accepted (unbeknown to KBR). And it is certainly foreseeable that this illegal conduct might be discovered, and the perpetrators prosecuted. It is axiomatic that when a person commits a crime, the actor contemplates the possibility of getting caught. Tamimi, through Khan, knew it would breach the subcontracts and commit a crime by offering kickbacks, yet chose to do so anyway.

The context and purpose of the contract between Tamimi and KBR must also be considered in deciding whether KBR's attorneys' fees incurred in the collateral litigation are foreseeable. KBR retained Tamimi as a subcontractor to provide food services to the American troops during wartime in the Middle East. 3RR10-16. The parties certainly contemplated through the inclusion of the "anti-kickback" provision in the contract that such offers were a possibility—especially where the work was to be performed in a country experiencing lawlessness and political unrest. The subcontracts specifically prohibit "kickbacks" not only because they are illegal, but also to avoid the exact course of events that unfolded

16

here—that the government could decline to reimburse KBR for its payments to Tamimi, and the parties could face criminal prosecution.

KBR included an anti-kickback notice in each of its subcontracts in connection with the war effort in Iraq. 3RR17, 20. Certainly, KBR expected its subcontractors to adhere to this agreement, and expressly contracted for compliance. 3RR17. KBR maintains an active compliance program that is "part of its corporate culture." 3RR35. KBR has written policies and procedures prohibiting kickbacks, and each employee participates in annual training to reinforce them. 3RR35. Similarly, KBR provides hotlines to allow employees to report potential violations of its corporate policies. 3RR36. The decisions of both the trial court and this Court render KBR's compliance program and the parties' anti-kickback provision—which expressly prohibits Tamimi from offering kickbacks—meaningless.

KBR was entitled to the recovery of attorneys' fees because it was forced to defend itself in collateral litigation that arose from Tamimi's breach of the contract and illegal conduct. The acceptance of any kickback offer was clearly foreseeable to Tamimi because it occurred "in the ordinary course of events," or at the very least, occurred "as a result of special circumstances, beyond the ordinary course of events, that [Tamimi] had reason to know." *See* RESTATEMENT (SECOND) OF CONTRACTS §351. The reasonably foreseeable consequences of a breach of

17

contract are compensable, "even if the criminal act of a third person intervened." *See* 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS §64:13 at n.44. This Court incorrectly determined that the acceptance of the kickback offers by KBR employees precluded KBR's recovery of its attorneys' fees. KBR respectfully urges the Court to reconsider that decision.

WHEREFORE, Appellees and Cross-Appellants Kellogg Brown & Root, L.L.C., Kellogg Brown & Root International, Inc., and Kellogg Brown & Root Services, Inc. respectfully requests that the Court grant this Motion for Rehearing, and for such other and further relief to which they may show themselves to be justly entitled to receive.

Respectfully submitted,

**PORTER HEDGES LLP**

By:   /s/ Lauren Beck Harris
          Lauren Beck Harris
          State Bar No. 02009470
          Nicholas A. Simms
          Kerry M. McMahon
          David W. Salton
          1000 Main Street, 36th Floor
          Houston, Texas 77002
          Telephone: (713) 226-6624
          Facsimile: (713) 226-6224

          ***Attorneys for Appellees and Cross-Appellants Kellogg Brown & Root, L.L.C., Kellogg Brown & Root International, Inc., and Kellogg Brown & Root Services, Inc.***

**CERTIFICATE OF SERVICE**

Pursuant to Rules 6.3 and 9.5(b), (d), and (e) of the Texas Rules of Appellate Procedure, this is to certify that on this 23rd day of November 2015, a true and correct copy of the foregoing was served on the following counsel of record by U.S. first class mail and by electronic delivery as follows:

Murphy S. Klasing
Weycer, Kaplan, Pulaski & Zuber, P.C.
11 Greenway Plaza, Suite 1400
Houston, TX  77046
*Attorneys for Appellant Tamimi Global Company Ltd.*

/s/ Lauren B. Harris
Lauren B. Harris

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(2)(D) because this brief contains 4,274 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

2.     This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) and the type style requirements of Texas Rule of Appellate Procedure 9.4(e) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font or larger.

/s/ Lauren B. Harris
Lauren B. Harris

# APPENDIX A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KELLOGG BROWN & ROOT SERVICES,       )
INC.,                                )
                                     )
            Plaintiff,               )
                                     )
      v.                             )  No. 09-351C
                                     )  (Judge Christine Miller)
THE UNITED STATES,                   )
                                     )
            Defendant.               )

### DEFENDANT'S AMENDED ANSWER AND COUNTERCLAIMS[1]

For its amended answer to plaintiff's complaint, defendant admits, denies, and alleges as follows:

The allegations contained in the first sentence of the first paragraph of plaintiff's "Introduction" are plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied. Admits the allegations contained in the second sentence of the first paragraph of plaintiff's "Introduction" to the extent supported by the referenced contract, which is the best evidence of its contents; otherwise denies the allegations. Admits the allegations contained in the third sentence of the first paragraph of plaintiff's "Introduction."

Denies the allegations contained in the first sentence of the second paragraph of plaintiff's "Introduction" for lack of knowledge or information sufficient to form a belief as to their truth. The remainder of the allegations contained in the second paragraph of plaintiff's

---

[1] Although we made earlier filings in this case related to the potential affirmative defenses and fraud counterclaims under seal because of the pendency of Mr. Terry Hall's testimony in a criminal case, this filing is not made under seal because Mr. Hall's testimony in that case has been completed and there is no longer any need to keep the information contained herein confidential.



KBRPROD0058839

"Introduction" constitute plaintiff's characterization of its case and conclusions of law, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

The allegations contained in the third paragraph of plaintiff's "Introduction" constitute plaintiff's characterization of its case and conclusions of law, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

1. Denies the allegations contained in paragraph 1 for lack of knowledge or information sufficient to form a belief as to their truth.

2. The allegations contained in paragraph 2 are plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

3. The allegations contained in paragraph 3 are conclusions of law to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

4. Admits the allegations contained in paragraph 4 that, on July 17, 2008, plaintiff filed a claim with Ms. Mendoza, to the extent supported by the referenced claim document, which is the best evidence of its contents; otherwise denies the allegations.

5. The allegations contained in paragraph 5 are conclusions of law to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

6. Admits the allegations contained in paragraph 6 to the extent supported by the referenced notification document, which is the best evidence of its contents; otherwise denies the allegations.

2

KBRPROD0058840

7. Avers that the referenced letter from the Administrative Contracting Officer was dated November 25, 2008, but other wise admits the allegations contained in paragraph 7 to the extent supported by the referenced letter, which is the best evidence of its contents; otherwise denies the allegations.

8. Admits the allegations contained in paragraph 8 to the extent supported by the referenced notification document, which is the best evidence of its contents; otherwise denies the allegations.

9. Admits the allegations contained in paragraph 9 to the extent supported by the referenced notification document, which is the best evidence of its contents; otherwise denies the allegations.

10. The allegations contained in paragraph 10 are conclusions of law to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

11. Admits the allegations contained in paragraph 11 to the extent supported by the referenced contract, which is the best evidence of its contents; otherwise denies the allegations.

12. Admits the allegations contained in paragraph 12 to the extent supported by the referenced novation document, which is the best evidence of its contents; otherwise denies the allegations.

13. Admits the allegations contained in paragraph 13 to the extent supported by the referenced contract, which is the best evidence of its contents; otherwise denies the allegations.

14. Admits the allegations contained in paragraph 14 to the extent supported by the referenced contract, which is the best evidence of its contents; otherwise denies the allegations.

3

KBRPROD0058841

15. Admits the allegations contained in paragraph 15 to the extent supported by the referenced contract, which is the best evidence of its contents; otherwise denies the allegations.

16. Admits the allegations contained in paragraph 16 to the extent supported by the referenced task order, which is the best evidence of its contents; otherwise denies the allegations.

17. Admits the allegations contained in paragraph 17 to the extent supported by the referenced task order, which is the best evidence of its contents; otherwise denies the allegations.

18. Admits.

19. Admits.

20. Admits the allegations contained in paragraph 20 that, on occasion during the performance of Task Order 59, some roads in Iraq were closed due to hostilities and contractors in Iraq were sometimes the targets of insurgent activities. The allegations in this paragraph relating to the means of performing the contract are admitted to the extent supported by the contract task order, which is the best evidence of its contents; otherwise denies the allegations. Denies all other allegations contained in this paragraph.

21. The allegations contained in paragraph 21 are plaintiff's characterization of its case, to which no response is required and are so vague that they are not susceptible to responsive pleading; to the extent that they may be deemed allegations of fact, they are denied.

22. Admits the allegations contained in paragraph 22 to the extent supported by the referenced task order, which is the best evidence of its contents; otherwise denies the allegations.

23. The allegations contained in paragraph 23 are conclusions of law to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

4

KBRPROD0058842

24. The allegations contained in paragraph 24 are conclusions of law to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

25. Admits the allegations contained in paragraph 25 to the extent supported by the referenced task order, which is the best evidence of its contents; otherwise denies the allegations.

26. Admits.

27. Admits the allegations contained in paragraph 27 to the extent supported by the referenced task order modification, which is the best evidence of its contents; otherwise denies the allegations.

28. Admits the allegations contained in the first sentence of paragraph 28 to the extent supported by the referenced statement of work, which is the best evidence of its contents; otherwise denies the allegations. Admits the allegations contained in the second sentence of paragraph 28.

29. Admits the allegations contained in paragraph 29 to the extent supported by the referenced statement of work, which is the best evidence of its contents; otherwise denies the allegations.

30. Admits.

31. Denies the allegations contained in paragraph 31 for lack of knowledge or information sufficient to form a belief as to their truth.

32. The allegations contained in paragraph 32 are ambiguous and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

5

KBRPROD0058843

33. Denies the allegations contained in paragraph 33 for lack of knowledge or information sufficient to form a belief as to their truth.

34. Admits.

35. Admits.

36. Admits the allegations contained in paragraph 36 to the extent supported by the referenced agreement, which is the best evidence of its contents; otherwise denies the allegations.

37. Admits the allegations contained in paragraph 37 to the extent supported by the referenced "work release," which is the best evidence of its contents; otherwise denies the allegations.

38. Admits the allegations contained in paragraph 38 to the extent supported by the referenced "revised work release," which is the best evidence of its contents; otherwise denies the allegations.

39. The allegations contained in paragraph 39 are conclusions of law to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

40. Admits the allegations contained in paragraph 40 to the extent supported by the referenced "Tamimi Subcontract" which is the best evidence of its contents; otherwise denies the allegations.

41. Admits the allegations contained in paragraph 41 to the extent supported by the referenced modification to "MA3," which is the best evidence of its contents; otherwise denies the allegations.

42. Admits the allegations contained in paragraph 42 to the extent supported by the referenced "Tamimi Subcontract" which is the best evidence of its contents; otherwise denies the

6

KBRPROD0058844

allegations.

43. Admits the allegations contained in paragraph 43 that facilities were constructed at Camp Anaconda at sites A-1 and A-4 by Prime Projects International. Denies the remainder of the allegations contained in paragraph 43 for lack of knowledge or information sufficient to form a belief as to their truth.

44. The allegations contained in paragraph 44 are ambiguous and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

45. Denies the allegations contained in paragraph 45 for lack of knowledge or information sufficient to form a belief as to their truth.

46. Denies the allegations contained in paragraph 46 for lack of knowledge or information sufficient to form a belief as to their truth.

47. Admits the allegations contained in paragraph 47 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

48. Denies the allegations contained in paragraph 48 for lack of knowledge or information sufficient to form a belief as to their truth.

49. Admits the allegations contained in the first sentence of paragraph 49 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations. Denies the allegations contained in the seconds sentence of paragraph 49 for lack of knowledge or information sufficient to form a belief as to their truth.

7

KBRPROD0058845

50. Denies.

51. Admits the allegations contained in paragraph 51, regarding the contents of plaintiff's "RFP" to the extent supported by the referenced document, which is the best evidence of its contents; otherwise denies the allegations. Denies the remainder of the allegations contained in paragraph 51 for lack of knowledge or information sufficient to form a belief as to their truth.

52. Admits the allegation contained in paragraph 52, that Tamimi and others responded to the "RFP." Denies the remainder of the allegation contained in paragraph 52.

53. Admits the allegations contained in the first sentence of paragraph 53 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

54. Admits the allegations contained in paragraph 54 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

55. Admits the allegations contained in paragraph 55 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

56. Admits the allegations contained in paragraph 56 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

57. Admits the allegations contained in paragraph 57 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

8

KBRPROD0058846

58. Denies the allegations contained in paragraph 58 for lack of knowledge or information sufficient to form a belief as to their truth.

59. Admits the allegations contained in paragraph 59 that plaintiff solicited and received proposals from vendors for the recruitment and transportation of laborers to Camp Anaconda. Denies the remainder of the allegations contained in paragraph 59 for lack of knowledge or information sufficient to form a belief as to their truth.

60. Admits the allegation contained in paragraph 60 that plaintiff awarded a subcontract to "ESS" in August 2004 to provide labor. Denies the remainder of the allegations contained in paragraph 60 for lack of knowledge or information sufficient to form a belief as to their truth.

61. Denies the allegations contained in paragraph 61 for lack of knowledge or information sufficient to form a belief as to their truth.

62. Admits the allegations contained in paragraph 62 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

63. Denies the allegations contained in paragraph 63 for lack of knowledge or information sufficient to form a belief as to their truth.

64. Admits the allegation contained in paragraph 64 that plaintiff terminated its subcontract with ESS. Denies the remainder of the allegations contained in paragraph 64 for lack of knowledge or information sufficient to form a belief as to their truth.

65. Denies the allegations contained in paragraph 65 for lack of knowledge or information sufficient to form a belief as to their truth.

KBRPROD0058847

66. Denies the allegations contained in paragraph 66 for lack of knowledge or information sufficient to form a belief as to their truth.

67. Denies the allegations contained in paragraph 67 for lack of knowledge or information sufficient to form a belief as to their truth.

68. Admits the allegations contained in the second sentence of paragraph 68 that Tamimi continued to perform its contract with plaintiff during negotiations. Denies the allegations contained in paragraph 68 for lack of knowledge or information sufficient to form a belief as to their truth.

69. Denies the allegations contained in paragraph 69 for lack of knowledge or information sufficient to form a belief as to their truth.

70. Admits the allegations contained in paragraph 70 to the extent supported by the referenced contract modification which is the best evidence of its contents; otherwise denies the allegations for lack of knowledge or information sufficient to form a belief as to their truth.

71. Admits the allegations contained in paragraph 71 to the extent supported by the referenced change orders which are the best evidence of their contents; otherwise denies the allegations.

72. Denies the allegations contained in paragraph 72 because the phrase, "substantially based upon" is ambiguous and for lack of knowledge or information sufficient to form a belief as to their truth.

73. Admits the allegations contained in paragraph 73 to the extent supported by the referenced change order which is the best evidence of its contents; otherwise denies the allegations.

10

KBRPROD0058848

74. Denies.

75. The allegations contained in paragraph 75 are plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

76. The allegations contained in paragraph 76 are ambiguous and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

77. The allegations contained in paragraph 77 are ambiguous and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

78. The allegations contained in paragraph 78 are ambiguous and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

79. Denies the allegations contained in paragraph 79 for lack of knowledge or information sufficient to form a belief as to their truth.

80. Admits the allegations, contained in paragraph 80, that plaintiff provided vouchers to the Government, that included statements of amounts paid to Tamimi pursuant to Task Order 59. Denies the remainder of the allegations contained in paragraph 80 for lack of knowledge or information sufficient to form a belief as to their truth.

81. Admits.

82. Admits.

83. Admits the allegations contained in paragraph 83 to the extent supported by the

11

KBRPROD0058849

referenced audit report which is the best evidence of its contents; otherwise denies the allegations.

84. Admits.

85. Admits the allegations contained in paragraph 85 to the extent supported by the referenced DCAA Form 1which is the best evidence of its contents; otherwise denies the allegations.

86. Admits the allegations contained in paragraph 86 to the extent supported by the referenced DCAA Form 1which is the best evidence of its contents; otherwise denies the allegations.

87. The allegations contained in paragraph 87 are plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

88. Admits the allegations contained in paragraph 88 to the extent supported by the referenced DCAA Form 1which is the best evidence of its contents; otherwise denies the allegations.

89. Admits the allegation contained in paragraph 89, that the "PCO" has withheld $41,070,624 from plaintiff. The remainder of the allegations contained in paragraph 89 are plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

90. Defendant incorporates by reference its responses to the allegations of paragraphs 1 through 89 of the complaint.

12

KBRPROD0058850

91. The allegations contained in paragraph 91 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

92. The allegations contained in paragraph 92 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

93. Admits the allegations contained in paragraph 93 to the extent supported by the referenced regulation, which is the best evidence of its contents; otherwise denies the allegations.

94. The allegations contained in paragraph 94 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

95. The allegations contained in paragraph 95 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

96. Denies.

97. The allegations contained in paragraph 97 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

98. The allegations contained in paragraph 98 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

KBRPROD0058851

99. The allegations contained in paragraph 99 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

100. The allegations contained in paragraph 10 are conclusions of law and plaintiff's characterization of its case, to which no response is required; to the extent that they may be deemed allegations of fact, they are denied.

101. Denies that plaintiff is entitled to the relief set forth in the prayer for relief immediately following paragraph 100, or to any relief whatsoever.

102. Denies each and every allegation not previously admitted or otherwise qualified.

14

KBRPROD0058852

### DEFENDANT'S FIRST AFFIRMATIVE DEFENSE

103. Plaintiff's claim is unenforceable because of the taint of "kickbacks."

### DEFENDANT'S COUNTERCLAIMS

104. These counterclaims arise pursuant to the Special Plea in Fraud, 28 U.S.C. § 2514, the Anti-Kickback Act, 41 U.S.C. §§ 53, 55, the False Claims Act, 31 U.S.C. § 3729, and under common law fraud.

105. The Court possesses jurisdiction pursuant to 28 U.S.C. §§ 1503 and 2508.

106. Defendant and counterclaim plaintiff is the United States.

107. Plaintiff and counterclaim defendant is Kellogg Brown & Root Services, Inc. ("KBR").

108. These counterclaims generally arise from the receipt of kickbacks by KBR employees from Tamimi Global Company ("Tamimi"). The two KBR employees most directly implicated in this case are Mr. Terry Hall, who was KBR's head of food services for Kuwait and Iraq from late 2002 through early 2004, and Mr. Luther Holmes, his deputy. Mr. Hall and Mr. Holmes were both receiving kickbacks from a high-level Tamimi employee at the same time that they were making decisions and recommendations that ensured that Tamimi would obtain lucrative dining facility ("DFAC") subcontracts from KBR pursuant to the LOGCAP III contract for which KBR would be reimbursed by United States taxpayer dollars along with a fee determined by the subcontract costs. These actions resulted in, among other things, the submission of falsely inflated and fraudulent claims to the contracting officer for payment from the United States Treasury.

15

KBRPROD0058853

109. In October 2002, Mr. Hall was assigned to Kuwait by KBR. Mr. Hall's responsibilities included being the Regional Food Services Manager for Kuwait (and Iraq, subsequent to its invasion by Coalition forces) under the LOGCAP III contract. The Regional Food Services Manager and his staff were responsible for, among other things, ensuring that subcontractors providing DFAC services for KBR, as required by task orders upon the LOGCAP III contract, were technically competent to perform such services; were responsible for helping craft statements of work for subcontractors providing DFAC services; were responsible for formally requisitioning DFAC services (including estimating the costs of such services) from the KBR subcontracting staff; and were responsible for overseeing performance of DFAC subcontracts.

110. In early 2003, Mr. Hall was joined in Kuwait by his newly-hired deputy, Mr. Luther Holmes.

111. One of the DFAC subcontractors supervised by Mr. Hall was Tamimi. At the time that Mr. Hall arrived in Kuwait, Tamimi was already providing DFAC services related to the LOGCAP III contract as a KBR subcontractor at Camp Arifjan, Kuwait.

112. Due to an electrical fire at the Camp Arifjan DFAC, caused through the fault of Tamimi, Mr. Hall and his superiors at KBR contemplated terminating KBR's subcontract with Tamimi in November 2002. They ultimately chose to continue to subcontract with Tamimi.

113. Through the performance of his duties and his dealings with Tamimi, Mr. Hall came to know and socialize with Tamimi's chief of operations and vice president, Mr. Mohammad Shabbir Khan.

16

KBRPROD0058854

114. In November 2002, Mr. Khan first offered a kickback to Mr. Hall, stating that the two could "make a lot of money together." Mr. Hall accepted no money from Mr. Khan during this conversation, but reported it to nobody.

115. At some point in late 2002 or early 2003, Mr. Hall began taking money from Mr. Khan. Mr. Hall understood that the money was being provided so that Tamimi would remain in KBR's good graces and continue to get DFAC contracts from KBR. The money provided to Mr. Hall first took the form of $5,000 in cash that Mr. Khan had delivered to him at the airport in Kuwait prior to his departure on a vacation in 2003. Mr. Khan caused $5,000 in cash to be delivered to Mr. Holmes at the airport at the same time. Mr. Khan also gave Mr. Hall an automated teller machine ("ATM") card that could be used to access a bank account into which Mr. Khan had placed $5,000. Mr. Hall used the ATM card to withdraw approximately $3,500 in cash from the bank account; Mr. Holmes was also given access to the account by Mr. Khan, and withdrew the remaining $1,500 from the account. Mr. Holmes was also given $10,000 or more in cash by Mr. Khan, which he gave to his secretary. Near the end of 2003, Mr. Khan gave Mr. Hall $20,000 which was ostensibly to be used as an investment in a "Golden Corral" restaurant, although Mr. Hall did not, in fact, make such an investment with Mr. Khan's money, nor did Mr. Khan ever request that it be paid back.

116. During the time that Mr. Holmes and Mr. Hall were receiving money from Mr. Khan, they were involved in decisions that were made to the benefit of Tamimi as a KBR subcontractor. In June 2003, KBR convened a board to determine which local contractors would be awarded "master agreement" subcontracts to perform DFAC services for KBR pursuant to the LOGCAP III contract. Once KBR awarded a "master agreement" to a contractor, it intended to

17

KBRPROD0058855

issue "work releases" upon the master agreement as means to order DFAC services at particular locations. Contractors not awarded master agreements would not be eligible for subcontracts to operate DFACs for KBR.

117. Mr. Holmes and Mr. Hall were amongst the KBR employees who sat upon the board to determine which contractors would be awarded master agreements. As Regional Food Services Manager for KBR, had Mr. Hall objected to the award of a master agreement to a contractor, it would have been highly unlikely that such an award would be made. Tamimi and five other contractors were awarded master agreements; the board decided not to award master agreements to several other contractors that sought them. The master agreement awarded to Tamimi was known as "Master Agreement 3."

118. KBR issued multiple work releases upon Master Agreement 3 to obtain DFAC services in response to task orders issued upon the LOGCAP III contract. The relevant LOGCAP III task orders were Task Order 59, which was issued in August 2003, but effective from June 2003 through April 2005, and Task Order 89, which covered services from May 2005 through August 2006. All told, Tamimi billed and KBR paid approximately $466,290,328 upon all of the work releases for Master Agreement 3. KBR regularly submitted vouchers to the United States seeking reimbursement for these amounts as direct costs, plus a base fee of 1 percent of direct costs (also referred to as "definitized costs"), and an award fee of up to two percent of direct costs, plus a fee for indirect costs. Mr. Hall and Mr. Holmes knew, when they accepted their kickbacks from Mr. Khan, that KBR would file vouchers with the United States seeking reimbursement for any Tamimi subcontracts as set forth above. Mr. Hall and Mr. Holmes also knew or had reason to know that the kickbacks that they received would lead to inflated contract

18

KBRPROD0058856

prices from Tamimi.

119. When KBR was tasked by the Army to take over performance of DFAC services at Camp Anaconda, Iraq, KBR decided to continue to utilize Tamimi, which was the incumbent contractor for the Army at Camp Anaconda. This decision was, in the initial instance, made, at the urging of Mr. Hall and Mr. Gatlin, by Mr. Daniel Petsche, who was a LOGCAP III subcontracts administrator for KBR, responsible for LOGCAP III subcontracting in Iraq. Mr. Petsche did not possess the authority from KBR to commit the company to more than a certain amount of spending on a particular subcontract, but he could make provisional decisions to agree to certain subcontracts and then seek ratification from superiors at KBR with the proper authority to commit the company to the larger contractual amounts. Mr. Petsche did not possess the authority to commit KBR to the contractual amounts that would be necessary for the Camp Anaconda DFAC contract.

120. Mr. Petsche made the decision to acquiesce to the award of the Camp Anaconda subcontract to Tamimi based in large part upon the pressure supporting the award that he received from Mr. Hall. Indeed, Mr. Petsche had contemplated having the Camp Anaconda DFAC subcontract be awarded to a different subcontractor than Tamimi, but changed his mind based upon the advocacy for Tamimi that he received from Mr. Hall.

121. Mr. Hall's strong advocacy on behalf of Tamimi, and the support given to Mr. Hall's positions by Mr. Hall's direct supervisor, Mr. Robert "Butch" Gatlin, influenced Mr. Petsche's decision-making relating to Tamimi at Camp Anaconda and elsewhere. Additionally, Mr. Hall wrote and signed the memorandum for the KBR procurement file justifying the sole-source award to Tamimi of the DFAC subcontract at Camp Anaconda.

19

KBRPROD0058857

122. Work Release 3 of Master Agreement 3 was the contractual vehicle by which KBR obtained DFAC services from Tamimi at Camp Anaconda, Iraq from August 2003 through December 2005. Tamimi billed and KBR paid approximately $307,630,344 upon Work Release 3 of Master Agreement 3. KBR then sought and obtained payment of the $307,630,344, plus base and award fees and fees for indirect costs, from the United States.

123. In late December 2003 Mr. Petsche was fired by KBR for receiving a gift from a subcontractor not Tamimi. In February 2004, shortly after his termination, Mr. Petsche was contacted by KBR employee David Hadcock. Mr. Hadcock had been reviewing KBR's Camp Anaconda DFAC procurement files and was searching for both an authorization and justification for the cost of Master Agreement 3, Work Release 3.

124. Mr. Petsche discussed the matter briefly with Mr. Hadcock on the telephone and sent a follow-up e-mail to Mr. Hadcock at his request. In the e-mail, Mr. Petsche stated that he had previously referred to the Anaconda DFAC as, "the mother of all DFAC drug deals" because of all of the irregularities surrounding it. In Mr. Petsche's words, the Anaconda DFAC was "predestined and out of control from the start." Mr. Petsche wrote that Tamimi's pricing for the Anaconda DFAC was "very close to the [amount in the internal KBR] requisition," which Mr. Petsche had thought indicated that the deal had been previously agreed to by others from KBR and Tamimi, but that he had chosen not to question it. Mr. Petsche further wrote that he had drafted a work release to effect this agreement, but had not signed it because he felt that he needed more data to justify its expense. Mr. Petsche explained the lack of a signed work release and price justification memorandum by writing, "I did not execute the Work Release. I did not do a Price Reasonableness write-up on it. I could not present it with the data and support I had."

20

KBRPROD0058858

Mr. Petsche added that, "[t]here is a whole lot more to this story" and suggested that similar irregularities could be found in other Tamimi subcontracts with KBR.

125. Upon receipt of Mr. Petsche's e-mail, Mr. Hadcock forwarded it to Mr. William Jonas, head of procurement for KBR, and Mr. Charlie Carr, the head of KBR's "DFAC team," which, by that time, had oversight of all DFACs in Kuwait and Iraq. Neither Mr. Hadcock, Mr. Jonas, Mr. Carr, nor any other KBR employee took any action based upon Mr. Petsche's e-mail or the allegations contained therein. No KBR employee ever conveyed Mr. Petsche's concerns (or any of their own) regarding the Camp Anaconda and other Tamimi contracts to any representative of the United States Government. In March 2004, after his receipt of Mr. Petsche's e-mail and after his forwarding of the e-mail to Mr. Jonas and Mr. Carr, Mr. Hadcock wrote a memorandum purporting to justify the costs for Master Agreement 3, Work Release 3. Only after Mr. Hadcock's memorandum was Master Agreement 3, Work Release 3 officially ratified by KBR officials with the authority to do so.

126. The original period of performance for Master Agreement 3, Work Release 3 concluded in March 2004. Through the issuance of change orders, KBR extended the period of performance of Master Agreement 3, Work Release 3 through December 31, 2005.

## Count I

### Special Plea In Fraud – 28 U.S.C. § 2514

127. The United States incorporates by reference the allegations set forth in paragraphs 104 through 126 above.

128. Pursuant to 28 U.S.C. § 2514, defendant's special plea in fraud seeks the forfeiture of the plaintiff's claim in this action.

21

KBRPROD0058859

129. The special plea in fraud statute, 28 U.S.C. § 2514, mandates, *inter alia*, the forfeiture of any claim asserted against the United States where fraud is practiced or attempted against the Government in inducing the Government to enter the contract, during performance of the contract, or in the proof or statement of a claim against the Government.

130. Performance of the LOGCAP III contract, in particular Task Orders 59 and 89, under which KBR was compensated for the costs of work performed under the various work releases of Master Agreement 3, was tainted by the fraud of the kickbacks received by KBR's employees, Mr. Hall and Mr. Holmes, when they sat upon the board that awarded Master Agreement 3 and when they took actions to encourage the issuance of Work Release 3 to Master Agreement 3 to Tamimi for work at Camp Anaconda.

131. Accordingly, pursuant to 28 U.S.C. § 2514, plaintiff's claim in this action is subject to forfeiture in its entirety.

## Count II

### Anti-Kickback Act – 41 U.S.C. §§ 53, 55

132. The United States incorporates by reference the allegations set forth in paragraphs 104 through 131 above.

133. The Anti-Kickback Act, 41 U.S.C. §§ 53, 55, prohibits employees of Government contractors from accepting "kickbacks" from subcontractors and establishes penalties for persons who knowingly violate the Act and for companies that violate the Act. A "kickback" is payment of money or a thing of value for the purpose of obtaining or rewarding favorable treatment of the subcontractor by the prime contractor.

22

KBRPROD0058860

134. By virtue of accepting funds from Mr. Khan in return for their favorable treatment of Tamimi and in reward of that treatment, Mr. Holmes and Mr. Hall both violated the Anti-Kickback Act.

135. The violations of the Anti-Kickback Act by Mr. Hall and Mr. Holmes are attributable to KBR because the two were acting as KBR's agents at the time that they accepted the kickbacks.

## Count III

### False Claims Act – 31 U.S.C. § 3729(a)(1)

136. The United States incorporates by reference the allegations set forth in paragraphs 104 through 135 above.

137. KBR knowingly presented and caused to be presented to officers and employees of the United States Government false or fraudulent claims for payment or approval by submitting vouchers for payment for costs associated with Master Agreement 3 and all of the work releases upon it. The claims were false or fraudulent because KBR knew that the award of Master Agreement 3 and the work releases upon it, including but not limited to Work Release 3, were tainted by kickbacks given by Mr Khan to Mr. Hall and Mr. Holmes.

## Count IV

### Rescission And Disgorgement (Master Agreement 3)

138. The United States incorporates by reference the allegations set forth in paragraphs 104 through 137 above.

23

KBRPROD0058861

139. Because of the kickbacks to Mr. Hall and Mr. Holmes, the portion of the LOGCAP III contract tainted by such kickbacks is void or voidable. Accordingly, the Government is entitled to be restored to its pre-contract position relating to these portions of the LOGCAP III contract.

140. Based upon the facts described above, the Government is entitled to the rescission of the portion of the LOGCAP III contract involving all work performed by KBR through its Master Agreement 3 subcontract with Tamimi, inasmuch as that subcontract was tainted by kickbacks and it would be contrary to public policy for the Government to pay for such unlawfully awarded work. The Government is also entitled to disgorgement of all sums paid to KBR as compensation related to the tainted subcontract.

### Count V

### Disgorgement (Task Order 59)

141. The United States incorporates by reference the allegations set forth in paragraphs 104 through 140 above.

142. Task Order 59 to the LOGCAP III contract was issued to KBR shortly after the kickback-tainted award by KBR of Master Agreement 3 to Tamimi. All work releases upon Master Agreement 3 were issued under the authority of Task Order 59. Because the kickbacks to Mr. Hall and Mr. Holmes necessarily tainted Task Order 59 at or about the time of award by establishing a relationship that influenced the pricing and cost of that task order, Task Order 59 unjustly enriched KBR.

143. Based upon the facts described the Government is entitled to disgorgement of all fees paid to KBR pursuant to Task Order 59.

24

KBRPROD0058862

## PRAYER FOR RELIEF

WHEREFORE, defendant, the United States, requests that the Court enter judgment in its favor, and against KBR as follows:

a. As to Count I, under the Special Plea in Fraud, 28 U.S.C. § 2514, against plaintiff, for the forfeiture of KBR's entire claim;

b. As to Count II, under the Anti-Kickback Act, 41 U.S.C. §§ 53, 55, against plaintiff, for damages in the amount of double the amount of the kickbacks given to Mr. Hall and Mr. Holmes, plus civil penalties as are allowable by law of $5,500 to $11,000 per violation, post-judgment interest, and costs;

c. As to Count III, under the False Claims Act, 31 U.S.C. § 3729, against the plaintiff, for treble the damages sustained by the United States, plus civil penalties as are allowable by law of $5,500 to $11,000 per violation, post-judgment interest, and costs;

d. As to Count IV, rescission and disgorgement related to Master Agreement 3, for rescission of the portion of the LOGCAP III contract that was effected by KBR through the use of Master Agreement 3, and for disgorgement of all moneys paid to KBR for direct costs, indirect costs, fixed fees, and award fees related to any work release upon Master Agreement 3, post-judgment interest, and costs;

e. As to Count V, for disgorgement of all moneys paid to KBR for fixed and award fees related to Task Order 59, post-judgment interest, and costs.

f. For the dismissal of KBR's complaint; and

g. For such other and further relief as the Court may deem appropriate.

25

KBRPROD0058863

Respectfully submitted,

TONY WEST
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

s/J. Reid Prouty
J. REID PROUTY
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn:    Classification Unit
         8th Floor
Washington, D.C.  20530
Tele: (202) 305-7586
Fax:  (202) 514-7969

Attorneys for Defendant

March 15, 2011

ECF
DOCUMENT
A TRUE COPY:
TEST:
Hazel G. Keahey
Clerk, U.S. Court of Federal Claims
By
Deputy Clerk

26

KBRPROD0058864

# APPENDIX B

E-FILED
Monday, 19 September, 2011 10:32:32 AM
Clerk, U.S. District Court, ILCD

**FILED**

SEP 1 6 2011

PAMELA E. ROBINSON, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT ROCK ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case No. 11- 40083 |
| | ) |
| vs. | ) |
| | ) |
| TAMIMI GLOBAL CO., LTD, a/k/a "TAFGA," | ) |
| | ) |
| Defendant. | ) |

## DEFERRED PROSECUTION AGREEMENT

Defendant Tamimi Global Co., Ltd., also known as "TAFGA" (and hereafter referred to as "TAFGA"), by its undersigned attorneys, pursuant to authority granted by TAFGA's Executive Board, and the United States Attorney for the Central District of Illinois (at times referred to herein as the "Government"), enter into this deferred prosecution agreement (the "Agreement").

The terms and conditions of the deferred prosecution agreement are as follows:

1.     TAFGA acknowledges and agrees that the Government will file a two-count criminal Information, attached as Exhibit 1 ("Information"), in the United States District Court for the Central District of Illinois charging in Count 1 Conspiracy to Pay Kickbacks in violation of Title 18, United States Code, Section 371, and charging in Count 2 Conspiracy to Pay Gratuities in violation of Title 18, United States Code, Section 371. In doing so, TAFGA (a) knowingly waives its right to indictment on these charges, as well as all rights to a Speedy Trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Central District of Illinois.



KBR
EXHIBIT
3

KBRPROD0057701

2.    TAFGA admits that it is responsible for the acts of its officers, employees and agents as set forth in the Information and the Statement of Facts, attached hereto as Attachment A (incorporated by reference in this Agreement), with the exception of the paragraphs in the Statement of Facts beginning with the phrase "According to the government's evidence." Should the Government pursue the prosecution that is deferred by this Agreement, TAFGA agrees that it will neither contest the admissibility of nor contradict the Statement of Facts, with the exception of the paragraphs beginning "According to the government's evidence," in any criminal proceeding, including during any guilty plea or sentencing proceedings. Subject to the provisions of this Agreement, however, TAFGA is free to defend any criminal, civil, or administrative action brought by the Government.

### Term of the Agreement

3.    This Agreement is effective for a period beginning on the date of the signing of this Agreement, and ending eighteen (18) months from that date (the "Term").

### Relevant Considerations

4.    The Government enters into this Agreement based on the individual facts and circumstances presented by this case. Among the facts considered were the following: (a) TAFGA's acknowledgment of past crimes by employees as described in the attached Statement of Facts; and (b) TAFGA's implementation and maintenance of remedial measures and compliance program, including the installation of a new Kuwait management team and an ethics and compliance team with oversight over U.S. government contracts and subcontracts, strengthening of its Code of Business Conduct, modernization of its Standard Operating Procedures for financial and accounting functions, institution of a compliance hotline, and retaining of a contract and compliance consultant to evaluate and monitor its compliance program; and (c) collateral consequences, including whether there would be disproportionate

2.

KBRPROD0057702

harm to employees and other persons not culpable of the conduct arising from the prosecution as set forth in the Statement of Facts.

### Payment of Monetary Criminal Penalty

5.    The Government and TAFGA agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following for Count 2:

| | | |
|---|---|---|
| Base offense level: | USSG §2C1.2(a)(2) | 9 |
| More than one gratuity: | (b)(1) | 2 |
| More than $400,000:[1] | (b)(2) | 14 |
| Total: | | 25 |

6.    The Government and TAFGA agree that Counts 1 and 2 constitute "Closely Related Counts" under §3D1.2, and, as such, no increase in the offense level results from those counts.

7.    The Government and TAFGA agree on the remaining calculations of the applicable fine range for TAFGA's criminal conduct under the Sentencing Guidelines:

| | | |
|---|---|---|
| Base Fine for Offense Level 25: | §8C2.4(a)(1) | $2.8 Million |
| Base Culpability Score: | §8C2.5(a) | 5 points |
| More than 1,000 employees in Unit: | (b)(2)(B)(i) | 4 points |
| Obstruction of Justice | (c) | 3 points |
| Acceptance of Responsibility | (g)(3) | -1 point |
| Total: | | 11 points |
| Multiplier range | §8C2.6 | 2.00 - 4.00 |
| Fine range | §8C2.7 | $5.6 to $11.2 Million |

---

[1]  This figure includes relevant criminal conduct that is attributable for sentencing purposes.

3

KBRPROD0057703

8.    TAFGA agrees to pay a monetary criminal penalty in the amount of $5.6 million. TAFGA and the Government agree that this fine is appropriate given the nature and extent of the criminal conduct of the TAFGA employees described in the Statement of Facts, the degree to which TAFGA has instituted programs by which to ensure future compliance, and TAFGA's agreement to comply with the other terms of this Agreement. The monetary criminal penalty in the amount of $5.6 million shall be paid in three equal installments in October 2011, April 2012, and September 2012. The payments are due by the 15th day of each of those months. This criminal fine is final and shall not be refundable under any circumstances. Furthermore, nothing in this Agreement shall be deemed a concession by the Government that $5.6 million is the maximum penalty that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Government agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as a part of a future judgment.

## Conditional Release from Criminal Liability as to Past Misconduct

9.    In return for TAFGA's compliance with the terms and conditions of this Agreement, the Government agrees not to use any information related to the conduct described in the attached Statement of Facts, or any information TAFGA disclosed to the United States Attorney for the Central District of Illinois, or which was otherwise known by the United States Attorney for the Central District of Illinois, prior to the date of this Agreement, against TAFGA, or any of its wholly-owned or controlled subsidiaries, in any criminal case, except: (a) in a prosecution or other proceeding relating to any crime of violence; (b) in a prosecution for making false statements or perjury under Title 18 of the United States Code; (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code;

4

KBRPROD0057704

or (d) any crime related to national security matters of the United States. In addition, the Government agrees, except as provided herein, that it will not bring any criminal prosecution against TAFGA, or any of its wholly-owned or controlled subsidiaries, related to the conduct of present and former officers, directors, managers, employees, agents, consultants, contractors and subcontractors, as described in the attached Statement of Facts, or relating to information TAFGA disclosed to the United States Attorney for the Central District of Illinois, or was otherwise known by the United States Attorney for the Central District of Illinois, prior to the date of this Agreement. This Paragraph does not provide any protection against the civil or criminal prosecution for any crimes or violations, if any, committed in the future by TAFGA, any of its wholly-owned or controlled subsidiaries, or any TAFGA owner, director, officer, manager, employee, or agent. In addition, this Paragraph does not provide any protection against civil or criminal prosecution of any present or former officer, director, employee, shareholder, agent, consultant, contractor, or subcontractor of TAFGA for crimes or violations, if any, committed by them.

## Corporate Compliance Program

10.    TAFGA represents that it has implemented and will continue to implement a compliance and ethics program designed to detect and prevent the types of offenses described in the attached Statement of Facts, and any other crimes under the laws of the United States, throughout its operations, including those of its affiliates. Implementation of these policies and procedures shall not be construed in any future enforcement proceeding as providing immunity or amnesty for any crimes not disclosed to the Government or not otherwise known to the Government as of the date of signing of this Agreement for which TAFGA would otherwise be responsible.

5

KBRPROD0057705

11.    In order to address any deficiencies in its internal controls, policies, and procedures, TAFGA represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures, in compliance with Federal Acquisition Regulation 52 203-13. TAFGA will adopt new or modify existing internal controls, policies, and procedures, designed to ensure compliance with FAR 52 203-13. The internal compliance code, standards, and procedures will include, but not be limited to, the minimum elements set forth in Attachment B, which is incorporated by reference into this Agreement.

### Corporate Compliance Reporting

12.    TAFGA agrees that within six months of signing this Agreement it will submit a written report to the Government regarding remediation and implementation of the compliance measures described in Attachment B. The report shall be transmitted to the United States Attorney's Office for the Central District of Illinois, 318 South Sixth Street, Springfield, IL 62701. TAFGA may extend the time period for issuance of the report with prior written approval of the Government based upon good cause shown therefore. TAFGA shall designate its Corporate Ethics Director as the person responsible for overseeing TAFGA's corporate compliance reporting obligations. During the Term of this Agreement, should there be reasonable grounds to believe that a violation of United States law has occurred or that questionable or corrupt payments or questionable or corrupt transfers of property or interests may have been offered, promised, paid, or authorized by any TAFGA entity or person, or any entity or person working directly for TAFGA, or that related false books and records have been maintained, in connection with contracts with the United States government or subcontracts that relate to United States government contracts, TAFGA shall promptly report such conduct to the United States Attorney's Office for the Central District of Illinois.

6

KBRPROD0057706

### Deferred Prosecution

13.    In consideration of (a) TAFGA's acknowledgment of past crimes by employees described in the attached Statement of Facts; (b) TAFGA's payment of a monetary criminal penalty of $5.6 million; and (c) TAFGA's continued compliance management, the Government agrees that any prosecution of TAFGA for the conduct set forth in the Information and the attached Statement of Facts, and for the conduct that TAFGA disclosed to the Government or is otherwise known by the Government prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement. Conduct is only considered disclosed to the Government if TAFGA provides written notification to the U.S. Attorney's Office for the Central District of Illinois, 318 S. 6th Street, Springfield, IL, prior to the signing of this Agreement.

14.    The Government further agrees that if TAFGA fully complies with all of its obligations under this Agreement, the Government will not continue the criminal prosecution against TAFGA described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within thirty (30) days of this Agreement's expiration, the Government shall seek dismissal with prejudice of the criminal Information filed against TAFGA described in Paragraph 1.

### Breach of the Agreement and Statute of Limitations Waiver

15.    If, during the Term of this Agreement, the Government concludes and the Court determines that TAFGA has (a) committed any felony under federal law subsequent to the signing of this Agreement, and that substantial authority personnel (as defined in the Commentary to §8A1.2 of the United States Sentencing Guidelines ["Substantial Authority

7

KBRPROD0057707

Personnel")[2] of TAFGA participated in, condoned, or directed that crime, or (b) Substantial Authority Personnel of TAFGA otherwise knowingly committed or directed a material, substantial breach of this Agreement, TAFGA shall thereafter be subject to prosecution for any federal criminal violation of which the Government has knowledge, including the charges in the Information, which may be pursued by the Government in the U.S. District Court for the Central District of Illinois or in any other federal district. TAFGA agrees that it will consent to U.S. personal jurisdiction for any such criminal prosecution, and TAFGA specifically appoints its legal counsel, currently the law firm of Schiff Hardin LLP, as the designee to accept service of legal process, to include a summons, for such action. In the event of a breach of this Agreement, any count of prosecution that is not time-barred by the applicable statute of limitations as of the date of the signing of this Agreement may be commenced against TAFGA notwithstanding the expiration of the statute of limitations between the date of the signing of this Agreement and the expiration of the Term. In addition, by signing this Agreement, TAFGA further agrees that the statute of limitations with respect to the offenses charged in the Information were not time-barred as of the date of the signing of this Agreement, and shall be tolled from that date through the expiration of the Term.

16.     In the event that the Government concludes that TAFGA has breached this Agreement, the Government agrees to provide TAFGA with written notice of its intent to file with the Court a request that the Court find that TAFGA has breached the Agreement and that

---

[2] The commentary provides that "Substantial authority personnel" means individuals who within the scope of their authority exercise a substantial measure of discretion in acting on behalf of an organization. The term includes high-level personnel of the organization, individuals who exercise substantial supervisory authority (e.g., a plant manager, a sales manager), and any other individuals who, although not a part of an organization's management, nevertheless exercise substantial discretion when acting within the scope of their authority (e.g. an individual with authority in an organization to negotiate or set price levels, or an individual authorized to negotiate or approve significant contracts).

KBRPROD0057708

the Government is seeking to continue or initiate a criminal prosecution resulting from such breach. TAFGA shall, within thirty (30) days of receipt of such notice, have the opportunity to respond to the Government in writing to explain the nature and circumstances of the alleged breach, as well as the actions TAFGA has taken to address and remediate the situation, which explanation the Government shall consider in determining whether to seek to continue or institute a prosecution.

17. In the event that the Government concludes and the Court determines that TAFGA has breached this Agreement: (a) all statements made by or on behalf of TAFGA to the Government or to the Court, including the attached Statement of Facts, with the exception of the paragraphs beginning "According to the government's evidence," and any leads derived from such statements, shall be admissible in evidence in any and all criminal proceedings brought by the Government against TAFGA; and (b) TAFGA shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of TAFGA prior or subsequent to this Agreement, and any leads derived therefrom, should be suppressed. The decision whether the conduct or statements of any current director or employee, or any person acting on behalf of, or at the direction of, TAFGA, will be imputed to TAFGA for the purpose of determining whether TAFGA has violated any provision of this Agreement shall be made by the Court.

18. TAFGA acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if TAFGA breaches this Agreement and this matter proceeds to judgment. TAFGA further acknowledges

9

KBRPROD0057709

that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Sale or Merger of TAFGA

19.   TAFGA agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a stock or asset sale, merger or transfer, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

## Public Statements by TAFGA

20.   TAFGA expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for TAFGA, make any public statement, except in civil, administrative, or regulatory proceedings as set forth below, contradicting the acceptance of responsibility by TAFGA set forth above or the facts described in the attached Statement of Facts, with the exception of statements made in a criminal proceeding as to paragraphs in the Statement of Facts beginning "According to the government's evidence." Any such contradictory statement shall, subject to (a) the cure rights of TAFGA described below, and (b) a determination by the Court, constitute a breach of this Agreement, and TAFGA thereafter shall be subject to prosecution as set forth in Paragraphs 15 through 18 of this Agreement.  If the Government concludes that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts as described above, the Government shall, prior to seeking to initiate a prosecution resulting from such breach, so notify TAFGA, and TAFGA may avoid a breach of this Agreement by publicly repudiating such statements(s) within five (5) business days after notification.  Consistent with the obligations of TAFGA as set forth above, TAFGA shall be permitted to raise defenses and to

10

KBRPROD0057710

assert affirmative claims in civil, administrative, or regulatory proceedings relating to the matters set forth in the Statement of Facts, or in criminal proceedings relating to the paragraphs of the Statement of Facts beginning "According to the government's evidence." This Paragraph does not apply to any statement made by any present or former employee of TAFGA in the course of any criminal, civil, administrative, or regulatory case initiated against such individual, unless such individual is speaking on behalf of TAFGA.

21. TAFGA agrees that if it or any of its direct or indirect affiliates or subsidiaries issues a press release or holds any press conference in connection with this Agreement, TAFGA shall first consult the Government to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Government and TAFGA; and (b) whether the Government has any objections to the release.

22. The Government agrees to bring to the attention of other government authorities, including debarment officials, the facts and circumstances relating to this Agreement, including the nature of the underlying conduct and TAFGA's acceptance of responsibility for the unlawful conduct described in the Statement of Facts. By agreeing to provide this information to debarment authorities, the Government is not agreeing to advocate on behalf of TAFGA, but rather providing facts to be evaluated independently by debarment authorities.

## Limitations on Binding Effect of Agreement

23. This Agreement is binding on TAFGA and the Government but specifically does not bind any other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Government will bring TAFGA's acceptance of responsibility and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by TAFGA.

11

KBRPROD0057711

## Notice

24.    Any notice to the Government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, to the United States Attorney for the Central District of Illinois, 318 South Sixth Street, Springfield, IL 62701.  Any notice to TAFGA under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, to its current counsel, which is, as of the date of this Agreement, Schiff Hardin LLP, Suite 6600, 233 South Wacker Drive, Chicago, IL 60606.

### THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK

KBRPROD0057712

### Complete Agreement

25. This Agreement sets forth all the terms of the agreement between TAFGA and the Government. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Government, the attorneys for TAFGA, and a duly authorized representative of TAFGA.


AGREED:

FOR TAMIMI GLOBAL CO., LTD.:

Date: September 9 , 2011

By: /s/Major General Perry V Dalby

Major General Perry V. Dalby (Ret.)
General Manager, TAFGA


Date: September 9 , 2011

By: s/Matthew C Crowl

Ronald S. Safer
Matthew C. Crowl
Schiff Hardin LLP
Counsel for TAFGA


FOR THE UNITED STATES OF AMERICA:

JAMES A. LEWIS
United States Attorney


Date: September 9 , 2011

By:

MATTHEW J. CANNON
Supervisory Assistant U.S. Attorney
318 South Sixth Street
Springfield, IL 62701
(217) 492-4450


13

KBRPROD0057713

E-FILED ·
Monday, 19 September, 2011  10:32:32 AM
Clerk, U.S. District Court, ILCD

## ATTACHMENT A

### STATEMENT OF FACTS

1.    The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the U.S. Attorney's Office for the Central District of Illinois (the "Government"), and Tamimi Global Co., Ltd., a/k/a "TAFGA," which is hereinafter referred to as "TAFGA". With the exception of the paragraphs below beginning, "According to the government's evidence," TAFGA admits, agrees, and stipulates to the following:  (a) TAFGA is responsible for the acts of its officers, employees, and agents as set forth below; (b) the facts set forth below are true and accurate; (c) should the government pursue the prosecution deferred by this Agreement, TAFGA will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding; and (d) if this matter was to proceed to trial, the Government would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information attached to the Agreement as Exhibit 1. Should this matter proceed to trial, TAFGA reserves the right to contest the facts set forth in paragraphs below that begin with the phrase, "According to the government's evidence." The evidence would establish the following:

**TAFGA and TAFGA Managers**

2.    Defendant TAMIMI GLOBAL COMPANY, LTD., also known as "TAFGA," and hereinafter referred to as "TAFGA," was a Saudi Arabian-based company that provided dining facility and other services to U.S. military personnel in the Middle East. TAFGA operated dining facilities ("DFACS") at U.S. military bases in Kuwait and Iraq as a prime contractor to the U.S. Army, as a subcontractor to a prime contractor to the U.S. Army, and as a contractor to the Kuwait government. During the period from 2002 through the date of this Information, TAFGA has received hundreds of millions of U.S. dollars as the result of contracts and subcontracts to provide services to U.S. military personnel in the Middle East.

3.    Mohammad Shabbir Khan ("Shabbir Khan") was TAFGA's Director of Operations for Kuwait and Iraq, whose duties included overseeing DFAC operations. Shabbir Khan was a

KBRPROD0057714

naturalized U.S. citizen.

4.      Zubair Khan Ahmed Khan ("Zubair Khan") was TAFGA's Operations Manager for Iraq, whose duties included supervising DFAC operations.

5.      An individual herein identified as "MSK" was a Project Manager for TAFGA whose duties included managing food service operations at DFACS operated by TAFGA in Kuwait.

6.      An individual herein identified as "MM" was an employee of TAFGA in Bahrain whose responsibilities included renewing employee visa and identification cards.

     **Other Persons**

7.      Stephen Lowell Seamans ("Seamans") was employed by the company now known as Kellogg Brown & Root Services, Inc. ("KBR") from approximately March 1999 through approximately May 2003. From approximately October 2002 through November 2002 and from approximately March 2003 through May 2003, Seamans worked for KBR in Kuwait as a Procurement Materials and Property Manager. His duties as a Procurement Materials and Property Manager included the negotiation and awarding of subcontracts under the U.S. Army's prime contract called the Logistics and Civil Augmentation Program III ( "LOGCAP III"). As such, Seamans was a public official.

8.      Ray Scott Chase ("Chase") served as a Sergeant First Class in the United States Army. From approximately January 2002 through December 2003, Chase was deployed to Kuwait in connection with Operation Iraqi Freedom. As part of his official duties in 2002 and 2003, Chase served as the Contracting Officer's Representative ("COR") and the Non-commissioned Officer in Charge ("NCOIC") for the military dining facility located at the United States Central Command at Camp Doha, Kuwait and U.S. Army contracts related thereto. As the COR and NCOIC, Chase supervised the food procurement, preparation and service operations at Camp Doha. In 2003, Chase also served as the NCOIC for a military dining facility at Camp Arifjan, Kuwait, and had similar responsibilities to those he had at Camp Doha. As such, Chase was a public official.

-2-

KBRPROD0057715

**LOGCAP III Contract**

9.      In December 2001, a United States Army contracting command located at the Rock Island Arsenal in Rock Island, Illinois, which is within the Central District of Illinois, awarded the LOGCAP III prime contract to KBR. The Army Field Support Command, also located at the Rock Island Arsenal, was the procurement command for LOGCAP III. As the procurement command for LOGCAP III, the Army Field Support Command obligated and committed the funding for this prime contract.

10.      Under LOGCAP III, KBR provided goods and services to the Army in Kuwait, Iraq, and other locations around the world, including DFACS at U.S. military bases in Kuwait and Iraq. The specific requirements under LOGCAP III were set forth in "Task Orders" that the Army Field Support Command issued to KBR. Under LOGCAP III, the United States Government paid KBR for the costs KBR incurred, plus an award fee. KBR commonly used subcontractors that invoiced KBR for their work. KBR thereafter invoiced the government which included the costs of subcontracts. KBR engaged TAFGA as a subcontractor to fulfill some of its DFAC obligations under the prime contract. The Resource Management Unit of the Army Field Support Command at the Rock Island Arsenal managed the money for the LOGCAP III prime contract, including the obligating of funding for the payment of Task Orders for DFAC operations.

11.      The LOGCAP III prime contract incorporated the Anti-Kickback Procedures set forth in Title 48, Code of Federal Regulations, Section 52.203-7. KBR's subcontracts with TAFGA likewise incorporated those same Anti-Kickback Procedures set forth in that section.

12.      KBR's subcontracts with TAFGA also contained a specific Anti-Kickback Notice:

Subcontractors and suppliers are prohibited from offering any money, fee, commission, credit, gift, gratuity, thing of value or compensation of any kind directly or indirectly to [KBR] employees for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

KBRPROD0057716

13. In or about October 2002, a LOGCAP III task order required KBR to establish a DFAC at Camp Arifjan in Kuwait, known as the Camp Arifjan Zone 2 DFAC. On or about October 14, 2002, KBR awarded the Camp Arifjan DFAC subcontract to TAFGA.

14. In or about April 2003, a LOGCAP III task order required KBR to establish a DFAC at a palace in Baghdad, Iraq. On or about April 14, 2003, KBR awarded the Baghdad Palace DFAC subcontract to TAFGA.

### Criminal Conduct -Count 1 of the Information

15. On or about October 9, 2002, Shabbir Khan hosted a birthday party for Seamans in Kuwait. At the party, Shabbir Khan provided Seamans with the services of a prostitute. When Shabbir Khan drove Seamans back to his quarters following the party, he offered to pay Seamans a kickback in connection with the Camp Arifjan Zone 2 DFAC.

16. On or about October 14, 2002, Seamans awarded the Camp Arifjan Zone 2 DFAC to TAFGA in the not-to-exceed amount of US $14,398,505 for a one-year period. Seamans executed the subcontract on behalf of KBR, and Shabbir Khan executed the subcontract on behalf of TAFGA.

17. According to the government's evidence, in or about April 2003, Seamans provided Shabbir Khan with bid information pertaining to the Baghdad Palace Subcontract. Seamans, knowing the amount of the bid submitted by another bidder, provided Shabbir Khan with the price TAFGA needed to bid to secure the award of the subcontract.

18. On or about April 14, 2003, Seamans awarded the Baghdad Palace subcontract to TAFGA in the not-to-exceed amount of US $2,000,000. Seamans awarded the subcontract by way of a document entitled "Letter Subcontract Anticipating a Fixed Price Type of Subcontract," which provided for the parties to enter into negotiations for a firm-fixed-price subcontract by April 24, 2003. Seamans executed the letter subcontract on behalf of KBR, and Shabbir Khan executed the letter subcontract on behalf of TAFGA.

19. On or about May 21, 2003, Seamans awarded to TAFGA a change order to the Baghdad Palace subcontract that increased the amount of the subcontract from US $2,000,000 to US

- 4 -

KBRPROD0057717

$7,381,725.90 and specified the period of performance as six months from April 14, 2003, or through October 13, 2003. Seamans executed the change order on behalf of KBR, and Shabbir Khan executed the change order on behalf of TAFGA.

20.     From in or about October 2002 through in or about October 2003, on or about the below-listed dates, in connection with the Camp Arifjan Zone 2 DFAC and Baghdad Palace DFAC subcontracts, Shabbir Khan paid and caused to be paid kickbacks to Seamans in the total amount of approximately US $133,000 in the form of U.S. currency, and wire transfers from bank accounts in the Middle East to accounts in the United States, including the following:

| | | |
|---|---|---|
| a. | 10/29/02 | Wire transfer of US $2,965 from Kuwait; |
| b. | 11/25/02 | Wire transfer of US $20,965 from Kuwait; |
| c. | 4/17/03 | Wire transfer of US $8,000 from Bahrain; |
| d. | 4/18/03 | Wire transfer of US $9,465 from Kuwait; |
| e. | 4/23/03 | Wire transfer of US $9,000 from Bahrain; |
| f. | 4/28/03 | Wire transfer of US $8,500 from Bahrain; |
| g. | 5/12/03 | Wire transfer of US $9,500 from Bahrain; |
| h. | 5/15/03 | Wire transfer of US $8,500 from Bahrain; |
| i. | 5/16/03 | Wire transfer of US $7,500 from Bahrain; |
| j. | 5/19/03 | Wire transfer of US $6,500 from Bahrain; |
| k. | 5/21/03 | Wire transfer of US $3,000 from Saudi Arabia; and |
| l. | 10/2/03 | Wire transfer of US $9,965 from Kuwait. |

21.     In or about April 2005, Shabbir Khan spoke with and otherwise communicated with Seamans, who was in the United States at the time, informing Seamans that an attaché from the embassy or consulate in Bahrain had recently inquired into the source of wire transfers that TAFGA or one or more of its managers had paid to Seamans as kickbacks in the spring of 2003. Shabbir Khan suggested to Seamans, in sum and substance, that if Seamans were to have a business deal with Zubair Khan, purportedly involving the joint purchase of a vehicle in the United States for sale in the

- 5 -

KBRPROD0057718

Middle East, this would make the wire transfers the authorities inquired about appear to be a legitimate business investment by Zubair Khan.

22.     On or about August 27, 2005, federal law enforcement personnel from the Central District of Illinois interviewed Zubair Khan in Kuwait. During the interview, Zubair Khan:

a.     Falsely stated, in sum and substance, that he and Seamans agreed in February or March 2003 to enter into a business venture to purchase armor plated, United States-made vehicles for sale in Iraq;

b.     Falsely stated, in sum and substance, that he directed TAFGA employee "MM" to wire transfer more than US $60,000 to Seamans as his investment in the business venture; and

c.     Falsely stated, in sum and substance, that the armored vehicle deal with Seamans fell through, and, thereafter, he tried to get Seamans to purchase a recreational vehicle ("RV") in the United States to sell in the Middle East, but the RV deal also fell through.

23.     On or about August 26 and 28, 2005, federal law enforcement personnel from the Central District of Illinois interviewed Shabbir Khan in Kuwait. During the interview, Shabbir Khan:

a.     Falsely stated, in sum and substance, that he thought certain wire transfers of money that persons affiliated with TAFGA made to Seamans were for a business venture between Zubair Khan and Seamans for the purchase of armored cars in the United States for sale in the Middle East for profit; and

b.     Falsely stated, in sum and substance, that he was unaware of any kickbacks and gratuities paid to Seamans by TAFGA personnel.

24.     According to the government's evidence, by at least August 26, 2005, when interviews of Zubair Khan, Shabbir Khan, and others commenced in Kuwait by federal law enforcement personnel from the Central District of Illinois, TAFGA was told of the kickback payments made to Seamans, and that there were efforts to conceal those past payments through a false cover story presented by Zubair Khan, Shabbir Khan, and, unwittingly, by Tamimi's then-counsel, to the law enforcement personnel on and after August 26, 2005.

- 6 -

KBRPROD0057719

25.    On or about August 28, 2005, during the interview in Kuwait with federal law enforcement personnel from the Central District of Illinois, Shabbir Khan provided the law enforcement personnel with false and misleading documents to support his and Zubair Khan's fictitious story about a business venture between Zubair Khan and Seamans. These documents included a document Shabbir Khan represented as an April 10, 2003, memorandum from Zubair Khan to Shabbir Khan in which Zubair Khan requested that Shabbir Khan advise the TAFGA finance department to give US $67,000 of Zubair Khan's year 2002 bonus to TAFGA employee "MM." These documents also included a document Shabbir Khan represented as an April 13, 2003, memorandum between TAFGA finance department employees stating that the Operations Manager of TAFGA had approved Zubair Khan's April 10, 2003, request.

26.    On or about the dates below, defendant TAFGA caused the Rock Island Division of the United States Attorney's Office, Central District of Illinois, to receive the following false and misleading documents from TAFGA's then legal counsel:

a.    September 12, 2005: documents relating to wire transfers made to Seamans by one or more TAFGA employees in the Spring of 2003;

b.    September 16, 2005: e-mails between Zubair Khan and Seamans concerning the fictitious business venture; and

c.    September 26, 2005: a memorandum repeating and crediting the fictitious business venture story.

27.    On or about October 28, 2005, Shabbir Khan and Zubair Khan met with Seamans in London, England. During the meeting, the three discussed the following, in sum and substance, among other things:

a.    Zubair Khan explained to Seamans the fictitious story he had told to the federal law enforcement personnel in Kuwait in August 2005;

b.    Zubair Khan instructed Seamans to tell this same false story to federal law enforcement personnel when they questioned him concerning the wire transfers from TAFGA;

- 7 -

KBRPROD0057720

c. Shabbir Khan and Zubair Khan told Seamans that they needed documentation showing that Seamans had wired approximately US $65,000 back to Zubair Khan's bank account in order to support the fictitious story they had told federal law enforcement personnel; and

d. Shabbir Khan and Zubair Khan further instructed Seamans to wire transfer a sum of money to Zubair Khan's bank account, that they would then transfer the same sum of money back to Seamans, and that this process was to continue until Seamans had sent a total of US $65,000 to Zubair Khan's bank account, and had received a total of US $65,000 in return, in order to support the fictitious story they had told federal law enforcement personnel.

28. On March 22, 2006, federal law enforcement personnel interviewed Shabbir Khan at the United States Attorney's Office in Rock Island, Illinois, in the Central District of Illinois. During the interview, Shabbir Khan:

a. Falsely stated, in sum and substance, that in 2003, Zubair Khan had a private side business deal with Seamans for the purchase of an armored vehicle in the United States for resale in the Middle East;

b. Falsely stated, in sum and substance, that to obtain money for Zubair Khan's investment in the armored car deal with Seamans, Zubair Khan asked TAFGA to give US $67,000 of his year 2002 bonus to TAFGA employee "MM;"

c. Falsely stated, in sum and substance, that none of the money provided to Seamans by TAFGA employee "MM" had anything to do with TAFGA's business with KBR;

d. Falsely stated, in sum and substance, that the armored vehicle deal with Seamans fell through;

e. Falsely stated, in sum and substance, that neither Shabbir Khan, Zubair Khan nor TAFGA intended to pay kickbacks to Seamans through the payments made to Seamans; and

f. Falsely stated, in sum and substance, that the payments to Seamans were not made because Seamans was involved in awarding or administering any subcontracts between KBR and TAFGA.

- 8 -

KBRPROD0057721

### Criminal Conduct -Count 2 of the Information

29.      In 2002 and 2003, defendant TAFGA provided dining facility services to the United States military at Camp Doha in Kuwait through a contract with the Kuwait government. TAFGA likewise provided the dining facility services at one of the Camp Arifjan DFACS, known as the Camp Arifjan Zone 1 DFAC, after that facility was set up in 2003.

30.      Ray Scott Chase was responsible for supervising all food procurement, preparation, and service at the Camp Doha DFAC and the Camp Arifjan Zone 1 DFAC. Chase was responsible for ordering food, supplies, and services for those DFACS from private contractors that held Blanket Purchase Agreements with the U.S. Army.

31.      According to the government's evidence, in approximately mid-2002, "MSK" met with Chase and solicited Chase to use Chase's position to order food for the Camp Doha DFAC, and according to government evidence was done to reduce TAFGA's obligation to provide food under its contract with the Kuwait government, thereby reducing TAFGA's costs and increasing its profits.

32.      According to the government's evidence, in approximately mid-2002, "MSK" gave Chase an envelope containing approximately US $10,000.

33.      According to the government's evidence, between approximately mid-2002 and December 2003, at monthly or bi-monthly intervals, "MSK" paid Chase cash amounts between approximately US $8,000 and US $20,000 because of official acts Chase performed and was going to perform in relation to the Camp Doha DFAC and the Camp Arifjan Zone 1 DFAC. According to the government's evidence, this included Chase's ordering of food in a manner that reduced TAFGA's obligation to provide food under its contract with the Kuwait government, thereby reducing Tamimi's costs and increasing its profits.

34.      According to the government's evidence, between approximately mid-2002 and December 2003, on two or three separate occasions, Shabbir Khan paid Chase cash amounts between approximately USD$8,000 and US $20,000.

35.      In addition, Shabbir Khan provided Chase with use of an apartment in Kuwait City

- 9 -

KBRPROD0057722

free of charge.

36.    In sum, TAFGA admits that it is responsible for the misconduct of its employees, who (a) agreed to provide Chase illegal gratuities; (b) in furtherance of that conspiracy gave Chase things of value, that is, United States currency and the use of an apartment, because of official acts performed, and that were to be performed, by Chase during the year 2002 through the end of the year 2003 in connection with contracts for dining facility services at Camp Doha in Kuwait and the Camp Arifjan Zone 1 DFAC; and (c) paid these gratuities unlawfully to Chase, that is, the gratuities were not provided to him as part of the proper discharge of his official duties.

### Other Relevant Conduct and Illicit Payments

37.    An individual herein identified as "TA" was TAFGA's Area Manager for the Balad Area in Iraq whose duties included managing the DFACS operated by TAFGA in that area.

38.    John Rivard (Rivard) served as a Major in the United States Army. From approximately March 2004 through February 2005, Rivard served as the Army's Chief of Contracting for Camp Anaconda which was located north of Baghdad in Iraq. His duties included supervising the process of awarding contracts for obtaining goods and services needed at and near Camp Anaconda.

39.    Theresa Russell (Russell) served as a Sergeant in the United States Army and worked and associated with Rivard at Camp Anaconda.

40.    According to the government's evidence, in or about 2004, Rivard participated in the awarding of a contract to TAFGA for DFAC operations at several forward operating bases in the vicinity of Camp Anaconda in Iraq. Approximately a month and a half after the contract was awarded, "TA" provided Rivard with US $10,000 in cash on account of Rivard's efforts in awarding the contract to TAFGA, and another US $10,000 in cash that "TA" directed be given to Russell.

41.    Terry Hall was employed by KBR in Kuwait as a Food Service Manager from approximately October 2002 through approximately April 2004. His duties included overseeing KBR food service operations in Kuwait and Iraq, primarily concerning the technical side of DFAC contract administration.

- 10 -

KBRPROD0057723

42.     An individual herein identified as "Person A" was employed by KBR in Kuwait during the time beginning in approximately February 2003 as a Food Service Technician, Food Service Supervisor, and ultimately the Deputy Regional Food Service Manager of LOGCAP III for Kuwait and Iraq.

43.     According to the government's evidence, between the end of 2002 and the beginning of 2004, Shabbir Khan paid Hall and "Person A" a combined total of approximately US $40,000 in connection with DFAC subcontracts that TAFGA had been awarded under LOGCAP III. Khan did so in order to ensure that TAFGA kept the DFAC subcontracts that it had, and to ensure that TAFGA would continue to get additional subcontracts as they became available.

44.     From approximately March 2003 through early 2005, an individual herein identified as "Person B" was employed by KBR. He served primarily as a Subcontracts Administrator in Iraq.

45.     According to the government's evidence, in early 2005, Zubair Khan paid "Person B" approximately US $40,000 as a gratuity for the renewal of a KBR subcontract awarded to TAFGA for a DFAC in Iraq.

46.     In 2005, Peleti "Pete" Peleti, Jr., was serving in Kuwait as a U.S. Army Chief Warrant Officer and the Army's Chief Food Service Advisor for the Middle East Region. He was the advisor to the Commander on all facets of the Army's food service program. Among his duties was the monitoring of food service contracts in Kuwait, Iraq and Afghanistan, including the acquisition and distribution of food and related food service supplies at Army bases and camps.

47.     According to the government's evidence, during Peleti's time as Food Service Advisor, Shabbir Khan provided him with airline tickets, food, drinks, several thousands of U.S. dollars, and the use of a "Party House" maintained by a TAFGA executive and other TAFGA representatives. Khan provided these gratuities to Peleti in light of Peleti's prominent position with the Army concerning food service and dining facilities.

**Medical Records**

48.     In furtherance of TAFGA's operation of DFACS under the LOGCAP III contract,

- 11 -

KBRPROD0057724

TAFGA employed and transported into Kuwait and Iraq several thousand food service workers from Bangladesh, Nepal, Sri Lanka, and elsewhere.

49.     One provision of the LOGCAP III task orders relating to DFACS required that food service personnel shall receive appropriate medical screening prior to employment. Screening was to include testing for infectious diseases, such as tuberculosis, typhoid fever, and hepatitis A. Food service workers' medical records were required to be maintained, and could be located at the respective DFACS.

50.     In March 2004, the Defense Contract Management Agency (DCMA), an agency responsible for oversight of the LOGCAP III prime contract, initiated a routine inspection of some of the DFACS operated by TAFGA, including one at Camp Arifjan in Kuwait. During the inspection, DCMA reviewed what was purported to be the medical records of TAFGA food service workers. DCMA questioned the legitimacy of some of the records, and requested additional medical information on TAFGA food service workers through the prime contractor, KBR.

51.     In response to a KBR demand for TAFGA's employees' medical screening records, TAFGA delivered to KBR in Kuwait City sets of photocopied documents purported to be the medical records of TAFGA's food service workers. Many of the records raised suspicion because they contained identical lab test results for multiple different food service workers. DCMA then conducted inspections at three other TAFGA operated DFACS in Kuwait and determined that all the purported medical records for TAFGA employees at each of those DFACS were forgeries. As a result, a federal investigation was initiated in the Central District of Illinois at Rock Island.

52.     In February 2005, a federal grand jury in the Central District of Illinois issued a subpoena to TAFGA requiring production of all of the company's food service workers' medical screening records. In response to the grand jury subpoena, from in or about May 2005 through in or about August 2005, TAFGA caused to be produced to the United States Attorney's Office in Rock Island, Illinois, in the Central District of Illinois, as the representative of the grand jury, approximately 300 personnel files for TAFGA food service employees. The medical records

- 12 -

KBRPROD0057725

contained in those personnel files were different from, and much more elaborate than, the medical records that TAFGA had provided to DCMA and KBR in Kuwait in March 2004. It was subsequently determined that many of the purported medical records contained within the personnel files produced by TAFGA in 2005 to the grand jury were not legitimate and had been fabricated. The personnel files were produced as follows:

     a.   On or about May 6, 2005, via hand delivery in Chicago, Illinois;

     b.   On or about May 19, 2005, via commercial interstate carrier, from Chicago, Illinois to Rock Island, Illinois;

     c.   On or about June 22, 2005, via commercial interstate carrier, from Chicago, Illinois to Rock Island, Illinois;

     d.   On or about July 7, 2005, via commercial interstate carrier, from Chicago, Illinois to Rock Island, Illinois;

     e.   On or about July 28, 2005, via commercial interstate carrier, from Chicago, Illinois to Rock Island, Illinois; and

     f.   On or about August 18, 2005, via commercial interstate carrier, from Chicago, Illinois to Rock Island, Illinois.

KBRPROD0057726

**E-FILED**
Monday, 19 September, 2011  10:32:32 AM
Clerk, U.S. District Court, ILCD

## ATTACHMENT B

## CORPORATE COMPLIANCE PROGRAM

In order to address past deficiencies in its internal controls, policies, and procedures regarding compliance with the applicable United States anti-corruption laws, TAFGA agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, TAFGA agrees to adopt new or to modify existing internal controls, policies, and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that TAFGA makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures, in compliance with Federal Acquisition Regulation 52 203-13.  At a minimum, this should include, but not be limited to, the following elements:

1.     Retention of a government contract compliance specialist to monitor TAFGA's compliance program and report to TAFGA's Legal Department.

2.     A clearly articulated corporate policy against violations of the anti-corruption laws of the United States.

3.     Promulgation of compliance standards and procedures designed to reduce the prospect of violations of the anti-corruption laws and TAFGA's compliance code. These standards and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of TAFGA in a foreign jurisdiction, including but not limited to, agents, consultants, representatives, and distributors (collectively, "agents");

4.     The assignment of responsibility to two or more senior corporate executives of TAFGA for the implementation and oversight of compliance with policies, standards, and

KBRPROD0057683

procedures regarding the anti-corruption laws. Such corporate officials shall have the authority to report matters directly to TAFGA's Executive Board or any appropriate committee thereof;

5. Mechanisms designed to ensure that the policies, standards, and procedures of TAFGA regarding the anti-corruption laws are effectively communicated to all directors, officers, employees, and, where appropriate, agents. These mechanisms shall include: (a) periodic training for all directors, officers, and employees, and, where necessary and appropriate, agents; and (b) annual certifications by all such directors, officers, and employees, and, where necessary and appropriate, agents, certifying compliance with the training requirements;

6. An effective system for reporting suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the anti-corruption laws for directors, officers, employees, and, where necessary and appropriate, agents;

7. Appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and TAFGA's compliance code by TAFGA's directors, officers, and employees;

8. Appropriate due diligence requirements pertaining to the retention and oversight of agents;

9. Standard provisions in agreements, contracts, and renewals thereof with all agents that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; and

10. Periodic testing of the compliance code, standards, and procedures designed to evaluate their effectiveness in detecting and reducing violations of anti-corruption laws and TAFGA's compliance code.

2

KBRPROD0057684